**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| NILSA CINTRON, on Behalf of Herself and all Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>WALGREEN CO., an Illinois Corporation,<br><br>Defendant. | Civil Action No.<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Nilsa Cintron ("Plaintiff" or "Ms. Cintron"), by and through her attorneys, brings this Class Action Complaint against Walgreen Co. ("Walgreens" or "Defendant"), individually and on behalf of all others similarly situated. Following the investigation of counsel and based upon information and belief, except as to the allegations specifically pertaining to herself and her counsel, which are based on personal knowledge, Ms. Cintron makes the following allegations:

## NATURE OF THE ACTION

1.      Ms. Cintron brings this class action on behalf of herself and a New Jersey class of consumers who purchased any of the following five Walgreens "Finest Nutrition" brand dietary supplements: Ginseng, Garlic, Echinacea, Gingko Biloba, and St. John's Wort (the "Affected Finest Nutrition Dietary Supplements" or the "Products"), from February 11, 2009 to the present (the "Class").

2.      Each of the Affected Finest Nutrition Dietary Supplements that Walgreens sells bears a label advertising that the Product contains certain ingredients. In addition to the main herbal ingredient, the label discloses, or is supposed to disclose, other substances in the capsule that the purchasers would be ingesting.

3.      These statements of identity, quantity, and purity are central to Defendant's packaging and labeling of the Products, which cause consumers to purchase the Products.

4.      Testing conducted by the New York State Attorney General's office, however, establishes that Defendant's labeling is deceptive and misleading because the Products do not contain the ingredients represented on the labels, and contain adulterants or undisclosed substances. Testing conducted by Plaintiff's counsel further confirms that the product Ms. Cintron purchased from Walgreens did not contain the ingredient represented on the product's label.

5.      If Ms. Cintron and the Class knew that the label statements were deceptive and misleading and that the Products did not contain the ingredients as represented on the labels, and/or that the Products contained adulterants or undisclosed substances, they would not have purchased the Products.

6.      Ms. Cintron and the Class were damaged, in an amount to be determined at trial, because they purchased Defendant's Products and received Products that did not contain the ingredients as represented on the labels, and/or received Products that contained adulterants or undisclosed substances, which were not what they had paid for.

7.      Defendant's wrongful conduct deceived and misled Ms. Cintron and the Class into purchasing Defendant's Products by representing that the Products contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed

substances, violating federal law and the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et. seq.*

## JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction over this action under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and (d), because: (1) there are at least 100 Class Members in the proposed Class; (2) the combined claims of proposed Class Members exceed $5,000,000 exclusive of interest and costs, and; (3) at least one Class Member is a citizen of a state other than Defendant's state of citizenship.

9.     This Court also has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367.

10.     This Court has personal jurisdiction over Walgreens because Walgreens resides in Illinois, purposefully avails itself of and has sufficient minimum contacts with the Illinois consumer market such that adjudicating this dispute here would be fair to Walgreens and would not offend traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), (c), and (d), because Walgreens resides in this District—which encompasses Defendant's principal place of business—conducts substantial business in this District, has sufficient minimum contacts with this District, and purposely avails itself of the markets in this District through the marketing and sale of its products in this District, and because a substantial part of the events giving rise to the claims asserted occurred in this District.

## THE PARTIES

12.     Ms. Cintron is a consumer residing in Dumont, New Jersey. In December 2014, she purchased the bottle of Walgreens Finest Nutrition Ginseng depicted below from a

Walgreens in or near Bergenfield, New Jersey.  Ms. Cintron decided to purchase the Walgreens

Finest Nutrition Ginseng after reading the product's label and seeing that the product purported

to contain ginseng.  If Ms. Cintron had known that the product did not contain ginseng as

represented on the label, and/or contained adulterants or undisclosed substances, she would not

have purchased it.



13.     Defendant Walgreens is an Illinois corporation with its principal place of business

in Deerfield, Illinois.  Walgreens is in the business of providing access to consumer goods and

services, as well as pharmacy, health, and wellness services.  Walgreens has thousands of retail

drugstores throughout the United States and reported over $76.3 billion in net sales for its fiscal

year ending August 31, 2014, with a gross profit of $21.5 billion.  Walgreens has trademarked the name "Finest Nutrition," and distributes and sells the Affected Finest Nutrition Dietary Supplements as their own store brand of dietary supplements.

## FACTUAL ALLEGATIONS

### The Lucrative Dietary Supplement Market Affects Wide Swaths of Consumers

14.     In enacting the Dietary Supplement Health and Education Act of 1994 ("DSHEA"), Pub. L. 103-417, 108 Stat. 4325 (codified in scattered sections of 21 U.S.C.), Congress found that "almost 50 percent of 260,000,000 Americans regularly consume dietary supplements of vitamins, minerals, or herbs," and that "total annual sales of such products… reach[ed] at least $4,000,000,000."[1]

15.     By 2002, the Nutrition Business Journal estimated that the market for dietary supplements was worth nearly $18 billion.[2]  By 2012, the Nutrition Business Journal claimed that the market was worth over $32 billion.[3]

16.     An October 2014 survey conducted by the Council for Responsible Nutrition, which characterizes itself as the "leading trade association representing dietary supplement and functional food manufacturers and ingredient suppliers,"[4] boasted that "68 percent of U.S. adults

---

[1] DSHEA §§ 2(9) & (12)(C).

[2] *See* Morris & Avorn, Internet Marketing of Herbal Products, 290 J. Am. Med. Assoc. 1505, 1505 n.4 (2003).

[3] *See* Council for Responsible Nutrition, Dietary Supplements: Safe, Regulated and Beneficial (2014), *available at*: http://www.crnusa.org/pdfs/DSSafeRegulatedBeneficial_rev0613.pdf.

[4] About CRN, Council for Responsible Nutrition, http://www.crnusa.org/who_about.html (last accessed Feb. 11, 2015).

report[ed] taking dietary supplements, including over 50 percent who report[ed] being regular users."[5]

17.     Ms. Cintron is one of the millions of Americans who have purchased dietary supplements.  Ms. Cintron purchased Walgreens Finest Nutrition Ginseng believing that it contained ginseng as represented on the label, and that it did not contain adulterants or undisclosed substances.  Walgreens deceived and misled Ms. Cintron and other Class Members.

**Federal Law Requires Manufacturers to Ensure the Identity, Quantity, and Purity of Dietary Supplements**

18.     Under DSHEA, dietary supplements are defined as, among other things, a "product… intended to supplement the diet that bears or contains… an herb or other botanical." [6]

19.     Dietary supplements are not subject to the strict United States Food and Drug Administration ("FDA") regulations that apply to drugs and medications.  They are, however, subject to certain provisions of  DSHEA and the regulations promulgated thereunder by the FDA.

20.     21 U.S.C. § 343(s) provides that a food "shall be deemed to be misbranded" if it is a dietary supplement and fails to list "the name of each ingredient" in the dietary supplement, the "quantity of each such ingredient," or "the label or labeling of the supplement fails to identify any part of the plant from which the ingredient is derived," or, if the supplement is either covered by the specifications of an official compendium, is represented as conforming to the specifications of an official compendium, and fails to so conform, or, for supplements that aren't

---

[5] Council for Responsible Nutrition, New Survey Reveals High Percentage of U.S. Population Take Dietary Supplements—and with High Confidence (Oct. 30, 2014), *available at*: http://www.crnusa.org/CRNPR14-CRNCCSurvey103014.html.

[6] 21 U.S.C. § 321(ff)(1)(C).  For purposes of the Federal Food, Drug, and Cosmetic Act, "a dietary supplement shall be deemed to be a food…." *Id.* § 321(ff).

covered by an official compendium, if it "fails to have the identity and strength that the supplement is represented to have."

21.    21 U.S.C. § 342(g)(1) provides that a food shall be deemed to be adulterated "[i]f it is a dietary supplement and it has been prepared [or] packed... under conditions that do not meet current good manufacturing practice regulations...."

22.    The current good manufacturing practice regulations promulgated by the FDA under DSHEA[7] require dietary supplement manufacturers, packagers, and labelers ("Manufacturer")[8] to "implement a system of production and process controls that covers all stages of manufacturing, packaging, labeling, and holding of the dietary supplement to ensure the quality of the dietary supplement...."[9]

23.    Manufacturers must establish precise "component specifications… to ensure… the purity, strength and composition of dietary supplements manufactured using the components…."[10]

24.    Manufacturers are required to extensively test each component used in the manufacture of dietary supplements.  This testing is conducted on each incoming shipment of

---

[7] *See* Current Good Manufacturing Practice in Manufacturing, Packaging, Labeling, or Holding Operations for Dietary Supplements, 72 Fed. Reg. 34752 (June 25, 2007).

[8] 21 C.F.R. § 111.3.

[9] *Id.* § 111.55; *see also id.* § 111.65 (requiring manufacturers to implement quality control systems).

[10] *Id.* § 111.70(b)(2).

components prior to their use in the manufacture of dietary supplements,[11] and again on each finished batch.[12]

25.     Each step of the manufacturing process must be performed according to a master manufacturing record.[13] Each time a batch of dietary supplements is produced, the manufacturer must create a batch production record that identifies, among other things, any deviations from the master manufacturing record.[14]

26.     Manufacturers must also retain representative samples of each unique lot of components, packaging, and labels, as well as representative samples of each lot of dietary supplements shipped.[15]

**Walgreens Deceptively and Misleadingly Claims That The Products Contain Ingredients As Represented On the Labels**

27.     Walgreens makes representations on the labels of each of the Affected Finest Nutrition Dietary Supplements regarding the ingredients in the Products. Specifically:

> (a)     Walgreens Finest Nutrition "Ginseng" purports to contain 200 mg of "Korean Ginseng… (*Panax ginseng*) (root) (standardized to contain 7% Ginsenosides, 14 mg)" per serving, and to also contain "Maltodextrin, Gelatin, Cellulose (Plant Origin), Silica, [and] Vegetable Magnesium Stearate";

---

[11] *Id.* § 111.75(a).

[12] *Id.* § 111.75(c).

[13]  *Id.* §§ 111.205 & 111.210 (establishing requirements for the master manufacturing record).

[14] *Id.* §§ 111.255 & 111.260.

[15] *Id.* §§ 111.80 & 111.83.



(b)    Walgreens Finest Nutrition "Odorless Garlic" purports to contain 10 mg of

"(*Allium sativum*) (bulb)… (a 100:1 extract equivalent to 1,000 mg of

fresh Garlic Bulb)" per serving, and to also contain "Soybean Oil, Gelatin,

[and] Glycerin";



(c)     Walgreens Finest Nutrition "Echinacea" purports to contain 125 mg of "Echinacea Extract… (*Echinacea purpurea*) (whole plant and root) (Standardized to 4% Phenolic Compounds)" per serving, and to also contain "Calcium Carbonate, Cellulose (Plant Origin), Silica, Polyethylene Glycol, Croscarmellose, Providone, Corn Starch, [and] Magnesium Stearate";



(d)     Walgreens Finest Nutrition "Double Strength Gingko Biloba" purports to contain 120 mg of "Gingko Biloba Extract (*Gingko Biloba*) (leaf) (Standardized to contain 24% Gingko Flavone Glycosides, 28 mg)" per serving, and to also contain "Rice Flour, Gelatin [and to contain <2% of] Silica [and] Vegetable Magnesium Stearate";



(e)    Walgreens Finest Nutrition "St. John's Wort" purports to contain 300 mg of "St. John's Wort Extract (*Hypericum perforatum*) (aerial) (Standardized to contain 0.3% Hypericin, 0.9 mg)" per serving, and to also contain "Maltodextrin, Gelatin, Magnesium Silicate, Vegetable Magnesium Stearate, [and] Silica."



28.     A reasonable consumer would expect the label statements regarding the identity, quantity, and purity of the Affected Finest Nutrition Dietary Supplements to be truthful and not deceptive or misleading.

**Testing Establishes That Defendant's Dietary Supplements Do Not Contain The Ingredients As Represented On the Labels**

29.     By a Cease and Desist Notification dated February 2, 2015, the New York State Attorney General, Eric T. Schneiderman informed Walgreens that testing (the "Tests") revealed that the overwhelming majority of the Products did not contain the ingredients as represented on their labels.[16]   The Tests further revealed the presence of adulterants and undisclosed substances that were not listed on the labels, and concluded that the Products were "were either unrecognizable or a substance other than what they claimed to be, and therefore fairly constitute contaminated or substituted products."  The New York State Attorney General ordered Walgreens to immediately cease selling the affected lots of the Products.

30.     The Tests were performed on six of Defendant's Finest Nutrition brand dietary supplements, including the affected Products.

31.     Each of the Products was tested fifteen times.  To conducts the Tests, investigators purchased the Affected Finest Nutrition Dietary Supplements at three Walgreens locations throughout New York State.  Each individual sample was then tested five times using DNA barcoding technology.

32.     DNA barcoding technology "uses state-of-the-art biotechnology to help identify plant material based on short, standardized gene sequences, in a rapid, accurate and cost-

---

[16] *See generally* Letter from Eric. T. Schneiderman, N.Y. Attorney General to Alexander Gourlay, President, Walgreens (Feb. 2, 2015), at 1, *available at*: http://www.documentcloud.org/documents/1532311-supplements.html#document/p9.

effective manner."[17]  The process has been lauded as a "simple and efficient method for accurate species identification of Natural Health products."[18]

      33.    The Tests concluded:

      (a)    Walgreens Finest Nutrition "Ginseng" contained "no genetic material from ginseng" but did contain genetic material from allium and oryza [rice];

      (b)    Walgreens Finest Nutrition "Garlic" contained genetic material from "palm, dracaena [the genus encompassing the common houseplant], wheat, and oryza, but "only 1/15 of the tests identif[ied] allium as present in the product";

      (c)    Walgreens Finest Nutrition "Echninacea" was found to contain allium, oryza, and "DNA material originating in the daisy family," but "[n]o DNA from Echinacea was identified";

      (d)    Walgreens Finest Nutrition "Gingko Biloba" was found to contain orzya, but "no gingko biloba DNA was identified";

      (e)    Walgreens Finest Nutrition "St. John's Wort" contained allium, oryza and dracaena, but "[n]o St. John's Wort was identified in the product."

---

[17] Newmaster et al, DNA Barcoding Detects Contamination and Substitution in North American Herbal Products, 11 BMC Medicine 222 (2013), *available at*: http://biomedcentral.com/1741-7015/11/222.  To perform DNA barcoding, researchers extract, purify, amplify, and sequence a sample of material containing DNA.  To identify plant species, researchers typically look either at a region of the chloroplast gene called the RuBisCo large subunit (*rbcL*), or a region of ribosomal RNA called the internal transcribed spacer (*ITS*).  These short, highly variable regions, provide researchers with a unique DNA "barcode" that can be catalogued in a database and used to identify individual plant species.

[18] *See, e.g.*, Wallace, et al., DNA Barcodes for Everyday Life:  Routine Authentication of Natural Health Products, 49 Food Research Intl. 446, 451 (2012).

34.     Plaintiff's counsel subjected the actual ginseng that Ms. Cintron purchased from Walgreens to DNA testing.  The tests conducted on Ms. Cintron's ginseng failed to identify the presence of ginseng DNA.  These results are consistent with the New York State Attorney General's tests.

**Independent Scientists Have Used DNA Barcoding To Repeatedly Demonstrate That Manufacturers Make Deceptive and Misleading Claims About the Content of Dietary Supplements**

35.     The Tests should have come as no surprise to Walgreens since several peer-reviewed scientific studies have used DNA barcoding to identify rampant deceptive and misleading practices within the dietary supplement market.

36.     In 2013, researchers at the Centre for Biodiversity Genomics at the University of Guelph published a study in which they used DNA barcoding to conclude that "[w]hat is listed on the label of herbal products is not always what is found within the product."[19]

37.     Using DNA barcoding, the Guelph researchers concluded that the majority (52%) of herbal products tested did not contain the ingredients they purported to contain.[20]  Most (59%) of the herbal products tested contained species of plants that were not listed on the product labels.  Some (33%) of the herbal products tested also contained contaminants and/or fillers that were not listed on the product labels.

---

[19] Newmaster et al, DNA Barcoding Detects Contamination and Substitution in North American Herbal Products, 11 BMC Medicine 222 (2013), *available at*: http://biomedcentral.com/1741-7015/11/222.

[20] The researchers found that "[h]igh quality DNA barcodes were obtainable for both *rbcL* and *ITS2* regions for 100% of the 100 vouchered herbal species." *Id.*  The researchers further concluded that the fact that the herbal products were processed was "not an impediment to recovering barcodes." *Id.*

38.     In 2012, a study published in Food Research International used DNA barcoding to determine whether dietary supplements purporting to contain ginseng actually contained the ingredient as represented.[21]

39.     The study determined that half of the tested supplements purporting to be Korean ginseng (*Panax ginseng*) were actually American ginseng (*Panax quinquefolius*), a different product.

40.     The authors of the study concluded that economic motivations were likely responsible in part for the deceptive and misleading labeling identified.

41.     Accordingly, in addition to federal regulations, Walgreens knew, or should have known, of the need for vigilance in purchasing herbs and herbal extracts from suppliers.

## CLASS ALLEGATIONS

42.     Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of herself and a class of New Jersey consumers, defined as:

> All citizens of New Jersey who purchased the Affected Finest Nutrition Dietary Supplements in New Jersey from February 11, 2009 to the present (the "Class").

43.     Excluded from the Class are Walgreens and its subsidiaries and affiliates; governmental entities and employees; the Judges to whom this case is assigned and any immediately family or staff members thereof; and all persons who timely elect to be excluded from the Class.

44.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in an individual action alleging the same claims.

---

[21] *See* Wallace, et al., DNA Barcodes for Everyday Life:  Routine Authentication of Natural Health Products, 49 Food Research Int'l. 446 (2012).

45. **Numerosity—Federal Rule of Civil Procedure 23(a)(1).** Members of the Class are so numerous that joinder of all members individually, in one action or otherwise, is impractical. Defendant's national packaging and labeling decisions emanated from Illinois and targeted consumers across the country, including in New Jersey. Although there are likely thousands if not millions of individuals who purchased the Affected Finest Nutrition Dietary Supplements, the number of Class members are unknown to Plaintiff at this time but will be determined through discovery. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, including U.S. Mail, electronic mail, Internet postings, and/or published notice.

46. **Commonality and Predominance—Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** This action involves questions of law and fact common to Plaintiff and all members of the Class, which predominate over any questions affecting individual Class Members. All Class Members were exposed to the deceptive and misleading statements that the Products contained the ingredients as represented on the labels, and understood the label statements to mean that the Products did not contain adulterants or undisclosed substances, because the statements were on the label of each of the Products sold. Common questions of law and fact—the resolution of which will resolve the issues for all class members—include:

(a) Whether Defendant's statements that the Products contained the ingredients as represented on the labels were deceptive or misleading;

(b) Whether Defendant's practices violated applicable law;

(c) Whether Plaintiff and Class Members sustained damages resulting from Defendant's conduct and, if so, the proper measure of damages, restitution, equitable, or other relief;

(d)     Whether Defendant breached its warranties to Plaintiff and the Class;

(e)     Whether Defendant was unjustly enriched by its conduct;

47.     **Typicality—Federal Rule of Civil Procedure 23(a)(3).**  Plaintiff's claims are typical of the claims of absent Class Members because, among other things, Plaintiff and all Class Members each sustained damages arising from Defendant's uniform and wrongful conduct, as described above, and were each exposed to Defendant's deceptive and misleading statements on the label of each of the Products sold.  Plaintiff is a member of the Class she seeks to represent.  Furthermore, there are no defenses available to Walgreens that are unique to Plaintiff.

48.     **Adequacy of Representation—Federal Rule of Civil Procedure 23(a)(4).**  Plaintiff understands and is willing to undertake the responsibilities of acting in a representative capacity on behalf of the proposed Class.   Plaintiff is an adequate representative of Class Members because she has no interests adverse to, or which directly conflict with, the interests of other Class Members and Plaintiff will fairly and adequately protect the interests of the Class.

49.     Plaintiff has engaged the services of counsel who are experienced in complex class litigation, who will adequately prosecute this action, and who will assert and protect the rights of and otherwise represent Plaintiff and the absent Class Members.

50.     **Declaratory and Injunctive Relief—Federal Rule of Civil Procedure 23(b)(2).**  This action is brought under Rule 23 because Defendant has acted or refused to act on grounds generally applicable to all members of the Class, thereby making appropriate final injunctive and declaratory relief, as described below, with respect to Class Members.

51.     **Superiority—Federal Rule of Civil Procedure 23(b)(3).**  A class action is superior to any other available means for the fair and efficient adjudication of this controversy,

and Plaintiff knows of no unusual difficulty that will be encountered in the management of this litigation that would preclude maintenance as a class action. The damages or other financial detriment suffered by Plaintiff and the Class Members are relatively small compared to the burden and expense that would be required to individually litigation their claims against Walgreens, so it would be impractical for Class Members to seek individual redress for Defendant's wrongful conduct. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the Court system. Accordingly, judicial determination of the common legal and factual issues essential to this case would be far more efficient and economical as a class action than piecemeal individual determinations.

## COUNT I

### (Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et. seq.*)

52.     Plaintiff incorporates by reference the allegations above as though fully set forth herein.

53.     Plaintiff brings this claim individually and on behalf of the Class.

54.     Walgreens misrepresented the Affected Finest Nutrition Dietary Supplements as containing the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances.

55.     Defendant's material misrepresentation that the Affected Finest Nutrition Dietary Supplements contained the ingredients as represented on the labels, and/or that the Products did not contain adulterants or undisclosed substances, constitutes an unconscionable commercial practice, deception, fraud, false promise, and/or misrepresentation as to the nature of the goods, in violation of New Jersey's Consumer Fraud Act.

56.     Plaintiff and the Class Members suffered an ascertainable loss caused by Walgreen's misrepresentation because:

(a)     They would not have purchased the Affected Finest Nutrition Dietary Supplements had they known that the Products did not contain the ingredients as represented on the labels, and/or contained adulterants or undisclosed substances; and/or

(b)     The value they received from the Affected Finest Nutrition Dietary Supplements was less than the price they paid to purchase the Products due to the mislabeling, as described above; and/or

(c)     The Affected Finest Nutrition Dietary Supplements were worthless and had no value due to the mislabeling, as described above.

## COUNT II

### (Breach of Warranty)

57.     Plaintiff incorporates by reference the allegations above as though fully set forth herein.

58.     Plaintiff brings this claim individually and on behalf of the Class.

59.     Plaintiff, and each member of the Class, formed a contract with Defendant at the time Plaintiff and the other Class Members purchased the Affected Finest Nutrition Dietary Supplements.  The terms of that contract include the promises and affirmations of fact made by Defendant on the Products' packaging, as described above.  This packaging constitutes express warranties and became part of the basis of the bargain, and are part of the standardized contract between Plaintiff and the members of the Class and Defendant.

60.     Through its packaging, Defendant creates express warranties that the Products contain the ingredients as represented on the labels, and/or that the Products do not contain adulterants or undisclosed substances.

61.     All conditions precedent to Defendant's liability under this contract were performed by Plaintiff and the Class when they purchased the Products and used them as directed.

62.     Despite the express warranties that the Affected Finest Nutrition Dietary Supplements contain the ingredients as represented on the labels, and/or that the Products do not contain adulterants or undisclosed substances, the Affected Finest Nutrition Dietary Supplements do not contain the ingredients as represented on the labels, and/or contain adulterants or undisclosed substances.

63.     Defendant breached express warranties about the Products and their efficacy because the products do not conform to Defendant's affirmations and promises that they contain the ingredients as represented on the labels, and/or that the Products do not contain adulterants or undisclosed substances, as described above.

64.     As a result of Defendant's breach of express warranty, Plaintiff and the Class were harmed in the amount of the purchase price of the Affected Finest Nutrition Dietary Supplements.

**COUNT III**

**(Breach of Implied Warranty)**

65.     Plaintiff incorporates by reference the allegations above as though fully set forth herein.

66.     Plaintiff brings this claim individually and on behalf of the Class.

67.     Plaintiff and the Class Members purchased Defendant's Products, which were packaged and labeled as containing the ingredients as represented on the labels, and as not containing adulterants or undisclosed substances.  Pursuant to those sales, and by Defendant's packaging, Defendant impliedly warranted that its Products contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances.  Plaintiff and the Class Members bought the Products from Defendant relying on Defendant's skill and judgment in furnishing suitable goods, as well as its representations that the Products contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances.  However, Defendant's Products do not contain the ingredients as represented on the labels, and/or contain adulterants or undisclosed substances.

68.     Defendant breached the warranty implied at the time of sale in that Plaintiff and the Class Members did not receive Products that contained the ingredients as represented on the labels, and/or Products that did not contain adulterants or undisclosed substances, and thus, the goods were not fit for the purpose as packaged and sold.

69.     As a result of this breach of warranty by Defendant, Plaintiff and the Class Members have suffered damages in an amount to be determined by this Court and/or a jury in that, among other things, they purchased and paid for Products that did not conform to what was promised on the package, and they were deprived of the benefit of their bargain and spent money on Products that did not have any value or had less value than was warranted, or they purchased Products that they would not have purchased and used had they known the true facts about them.

## COUNT IV

### (Unjust Enrichment)

70.     Plaintiff incorporates by reference the allegations above as though fully set forth herein.

71.     Plaintiff brings this claim individual and on behalf of the Class.

72.     Plaintiff and the Class Members conferred a benefit on Walgreens by purchasing the Products.

73.     Walgreens has been unjustly enriched in retaining the revenues derived from Class Members' purchases of the Products.  Retention of such revenues under these circumstances is unjust and inequitable because Walgreens deceptively and misleadingly claimed that the Products contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances.  Defendant's deceptive and misleading statements injured Plaintiff and Class Members because they would not have purchased the Products if the true facts concerning their composition had been known.

74.     Because Defendant's retention of the non-gratuitous benefit conferred on it by Plaintiff and the Class Members is unjust and inequitable, Walgreens must pay restitution to Plaintiff and the Class Members for its unjust enrichment, as ordered by the Court.

## COUNT V

### (Violation of the Magnuson-Moss Act, 15 U.S.C. § 2301 *et seq.*)

75.     Plaintiff incorporates by reference the allegations above as though fully set forth herein.

76.     Plaintiff brings this claim individual and on behalf of the Class.

77.     Plaintiff and the Class are consumers as defined in 15 U.S.C. § 2301(3).

78.     Defendant is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) & (5).

79.     The Affected Finest Nutrition Dietary Supplements are products as defined in 15 U.S.C. § 2301(6).

80.     By reason of Defendant's breach of its implied warranties and express warranties that the Affected Finest Nutrition Dietary Supplements contained the ingredients as represented on the labels, and that the Products did not contain adulterants or undisclosed substances, Walgreens has violated the statutory rights due to Plaintiff and the Class Members pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, thereby damaging Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, pray for judgment against Defendant as follows:

A.     An order certifying the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointing Plaintiff and her counsel to represent the Class Members;

B.     An order declaring that Defendant's acts and practices violate the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, the New Jersey Consumer Fraud Act, N.J. Stat. Ann. § 56:8-1, *et seq.*, breach express and implied warranties, and constitute unjust enrichment;

C.     For damages pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.*, and New Jersey law in an amount to be determined at trial, including interest;

D.     For restitution for monies wrongfully obtained and/or disgorgement of ill-gotten revenues and/or profits;

E.     A permanent injunction enjoining Defendant from continuing to harm Plaintiff and the Class Members by selling the Affected Finest Nutrition Dietary Supplements with the

deceptive and misleading label statements, and violating federal and New Jersey law, and

requiring Defendant to institute an appropriate quality-control program;

      F.      An order requiring Defendant to adopt and enforce a policy that requires

appropriate removal of the deceptive and misleading label statements, which complies with

federal and New Jersey law;

      G.      Reasonable attorneys' fees and the costs of the suit; and

      H.      Such other relief as this Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of her claims by jury to the extent authorized by law.

DATED:      February 11, 2015

                        NILSA CINTRON, individually and on behalf of all others similarly situated

            By:    */s/ Katrina Carroll*
                    One of the Attorneys for Plaintiff
                    And the Putative Class

Katrina Carroll
Kyle A. Shamberg
**LITE DEPALMA GREENBERG, LLC**
Chicago Office
211 West Wacker Drive
Suite 500
Chicago, IL 60606
Telephone:    312.750.1265
Email:      kcarroll@litedepalma.com
              kshamberg@litedepalma.com

**MILBERG LLP**
Andrei V. Rado (pro hac vice forthcoming)
Henry J. Kelston (pro hac vice forthcoming)
One Pennsylvania Plaza
New York, NY 10119
Telephone:    (212) 594-5300
Facsimile:    (212) 868-1229
Email:      arado@milberg.com

hkelston@milberg.com

**LITE DEPALMA GREENBERG, LLC**
Bruce D. Greenberg (*pro hac vice* forthcoming)
Two Gateway Center, 12th Floor
Newark, NJ 07102
Telephone:     (973) 623-3000
Facsimile:     (973) 877-3845
Email:          bgreenberg@litedepalma.com

Counsel for Plaintiff